Filed 12/30/14  In re E.D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re E.D. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066187 |
| Plaintiff and Respondent, | (Super. Ct. No. J518660D-E) |
| v. | |
| CRYSTAL S., | |
| Defendant and Appellant; | |
| MIA S. et al., | |
| Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Edlene C. McKenzie, Commissioner.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant Crystal S.

Patricia K. Saucier, under appointment by the Court of Appeal, for Mia S., A.S. and Christopher S., Minors.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Crystal S. appeals orders denying her petition to reinstate family reunification services under Welfare and Institutions Code section 388[1] and terminating parental rights to her children, E.D. and G.D., under section 366.26. She argues the juvenile court erred when it determined the beneficial parent/child relationship and the sibling bond exceptions did not apply. The children's siblings also challenge the finding the sibling bond exception did not apply. We affirm the findings and orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Crystal S. is the mother of five children, Mia S., A.S., Christopher (collectively, the older children or older siblings) and E.D. and G.D. (together, the younger children). The children are now ages eight, seven, five, four and two years old, respectively. This appeal concerns the termination of parental rights to E.D. and G.D. The younger children's father, Gabriel D., does not appeal.

In April 2013, the San Diego County Health and Human Services Agency (the Agency) detained the children in protective custody and filed petitions under section 300, subdivision (b) alleging the children had suffered or were at substantial risk of suffering serious physical harm as a result of their parents violent confrontations, which often occurred in the children's presence. Crystal initially agreed not to permit Gabriel in the home, but allowed him to return.

---

[1] All further statutory references are to the Welfare and Institutions Code.

The family lived in a motel room, which was filthy. The petitions further alleged Gabriel injected methamphetamine and had a history of drug use. Crystal coached the older children to lie about the domestic violence in the home. She later acknowledged the children were exposed to approximately nine incidents of domestic violence.

The court sustained the jurisdictional allegations and removed the children from the custody of Crystal and their respective fathers. E.D. and G.D. were placed with their paternal aunt and uncle, the C.'s. G.D. was four months old when she was placed with her aunt. E.D. was just shy of his third birthday. The older children were placed together in foster care. The three boys, Christopher, A.S., and E.D. displayed aggressive behaviors. A.S. could be violent. Seven-year-old Mia appeared to be parentified. She worried about being separated from E.D. and G.D. Mia said she often cared for G.D. while Crystal was sleeping.

Crystal's case plan required her to complete a domestic violence treatment program, participate in counseling, and complete a parenting education course. She did not participate in all aspects of her case plan. Crystal maintained telephone contact with Gabriel while he was incarcerated. After Gabriel was released from custody, Crystal resumed her relationship with him despite a restraining order. Aunt C. said the parents spent a weekend together and Gabriel appeared to be under the influence of drugs.

Aunt C. and the older children's foster parent arranged for the children to visit each other. The children were very happy to see each other. Mia missed her younger siblings. E.D. missed Mia and Christopher and enjoyed playing with them.

Crystal was chronically late for visits with her children, scheduled appointments and services. The children were happy to see her. They loved her and enjoyed their visits. Crystal tried to spend time with each child. She was patient and loving. The Agency planned to allow

Crystal to have unsupervised visits until it learned she had resumed her relationship with Gabriel. The social worker said Crystal appeared to be more vested in the older children and was somewhat disconnected from her younger children. Crystal had problems redirecting and disciplining the children.

Gabriel was arrested and incarcerated in November 2013 on charges of robbery and being under the influence of a controlled substance.

On November 15, 2013, at the six-month review hearing, the court terminated reunification services and set a section 366.26 hearing for the younger children. Crystal continued to receive reunification services for the older children.

A.S.'s behaviors deteriorated. He hit his best friend and his foster parents in the face. He kicked his foster parents, pulled their hair and threw objects. In February 2015, after A.S. began to scratch and hit Mia and Christopher, the Agency placed A.S. in another foster home where he could receive one-on-one care and intensive behavioral services. Crystal blamed the foster mother for A.S.'s behavior.

Following A.S.'s placement in a different foster home, the children's three caregivers found it difficult to arrange sibling visitation.

In April 2014, Crystal filed a section 388 petition asking the court to reinstate family reunification services for the younger children. She alleged with the exception of some missed visits in December 2013 and January 2014, she regularly and consistently visited E.D. and G.D. and they were bonded with her. Crystal said she completed a domestic violence support group and a parenting course.

A combined hearing on Crystal's section 388 petition and the section 366.26 hearing was held on May 30, and June 16 and 23, 2014.

4

A facilitator for a women's support group for domestic violence testified Crystal started their program in July 2013 and completed it in March 2014. She missed 17 sessions. Part of the training was to help women learn the behavioral effects of domestic violence on children, which included acting out, inability to concentrate, depression, anxiety, defiance, sleep disorders and posttraumatic stress disorder.

Crystal's therapist said Crystal initially wanted to keep Gabriel in the family as the father figure. Crystal had completed a safety plan but had not yet started working on a relapse prevention plan.

A social worker informed the court that Crystal began therapy in February 2014. Crystal attended the first session but missed three out of the next four sessions. She attended three out of six classes for parents of children less than six years of age, and four out of six classes for parents of children ages six through 12. Crystal struggled to take any responsibility for the children's circumstances. She saw herself as the victim, not her children. The social worker testified Crystal had some regular visits with her children, but she was chronically late and the visits did not last the full two hours. Crystal's visits with the children were sporadic from November through February.

Ernesto Escobar, the permanency planning social worker, testified Crystal had periods in which she was highly motivated but stopped attending services at other times. In his opinion, Crystal did not have a parental role with E.D. and G.D. E.D. was distressed when visits were over. It was unusual for a child to continue to demonstrate distress when he or she had been separated from a parent for a long time. Between May 30 and June 16, Crystal did not request any visits with E.D. and G.D.

Escobar observed one visit when all the siblings were present. He said each of the children had different levels of attachment to their siblings. G.D. did not have a sibling bond with her three oldest siblings. Sibling visits were not occurring as frequently as the Agency wanted. Escobar acknowledged the sibling bonds were stronger at the time the children were removed from their parents' care than they were at the current time. Escobar said there was no possibility of placing the children together. Aunt C. was willing to adopt E.D. and G.D. Escobar believed that the younger children's bonds with their three older siblings were not sufficiently strong to justify the selection of a plan other than adoption. E.D. believed that Aunt C.'s children were his siblings.

Aunt C. testified she considered the older children as her niece and nephews. She saw them at family gatherings. She and the children's other caregivers had conflicting schedules, which made it difficult to arrange sibling visits. At visits, the children were happy to see each other. Mia and G.D. played. At a recent visit, A.S. did not want to interact with E.D. E.D. did not ask to visit his older siblings.

Aunt C. offered to facilitate Crystal's visits with the younger children more than 100 times. Crystal was supposed to have two visits a week with them. Crystal visited E.D. and G.D. approximately 15 percent of the time. At other times, she would not show up and did not call to say she was not coming. In April, Aunt C. arranged for Crystal to come for E.D.'s birthday, who was turning four years old. Crystal said she wanted to bring a birthday cake. Aunt C. did not tell E.D. about the visit. Crystal did not show up for E.D.'s birthday.

Eight-year-old Mia testified when she lived with her siblings, they played together and had fun. They celebrated birthdays with family and had cake and presents. They had not celebrated any birthdays with E.D. and G.D. since they were taken away. They used to

6

celebrate all the holidays together. Mia said she wanted all her brothers and sister to be together. It had been two months since she last saw her two youngest siblings. E.D. and G.D. were happy to see them. They ran to their older siblings and gave them hugs. Mia said they were all very close. The three boys liked to play together. She missed taking care of E.D. and G.D. If they could not go back to their mother, Mia hoped she and her siblings would be adopted together.

Crystal testified she visited her younger children twice a month. E.D. called her "mom." He was happy to see her and would consistently ask her, "When am I going to go with you?" Crystal said G.D. did not know her as a mother figure. Crystal acknowledged she did not consistently visit E.D. and G.D. during a period of depression. Crystal said E.D. had a bond with his older siblings, but G.D. did not.

The court denied Crystal's request to reinstate her reunification services. In view of Crystal's inconsistent participation in services and the minimization of her relationship with Gabriel, she showed only that her circumstances were changing. The court noted that Crystal was at least a half hour late to the last two court sessions and said her chronic tardiness would adversely impact the children's health, education and therapeutic needs. Further, Crystal did not consistently visit E.D. and G.D. and did not show it was in their best interests to grant the petition.

The court found that the children were likely to be adopted and none of the exceptions under section 366.26, subdivision (c)(1) applied. The court faulted the Agency for not doing more to ensure frequent sibling visits, but found it significant that E.D. named G.D. and his two cousins as his siblings, not Mia, A.S. or Christopher. Noting that Mia's testimony was "heart wrenching," the court found that the younger children would benefit more from the

7

permanency of adoption than they would from maintaining the sibling relationship, and terminated parental rights.

DISCUSSION

A

*Section 388 Petition*

Under section 388, a parent, interested person or the dependent child (generically, petitioner) may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petitioner requesting the modification has the burden to show a change of circumstances or new evidence, and that the proposed modification is in the child's best interests. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415; Cal. Rules of Court, rule 5.570(e).)

In evaluating whether the petitioner has met his or her burden to show changed circumstances, the juvenile court should consider a number of factors, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531-532 (*Kimberly F.*).)

We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) While the abuse of discretion standard gives the trial court substantial latitude, "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the

8

confines of the applicable principles of law is outside the scope of discretion and we call such an action an 'abuse' of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)

Under section 388, subdivision (a), the focus of a petition for modification is on whether the petitioner has shown a legitimate change of circumstances. The court could reasonably conclude that Crystal did not make the required showing. There is substantial evidence to support the finding that Crystal's circumstances, while changing, were not yet changed. (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

Crystal was offered or provided services for more than 12 months. Her participation in services was inconsistent. Despite attending therapy and domestic violence prevention classes, Crystal violated a restraining order and continued to minimize her relationship with Gabriel. The violence in the home had been extensive and Crystal was not able to easily resolve her issues concerning her acceptance of domestic abuse. (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) The court reasonably inferred Crystal did not show she could be trusted to protect her children from domestic violence.

In addition, the record shows that Crystal did not regularly visit E.D. and G.D., and they were happy, safe and stable with their aunt and uncle, who were willing to adopt them. G.D. did not know Crystal as a mother figure. The record supports the reasonable inference that G.D. was attached to her aunt, who had cared for her since she was three months old. In view of Crystal's history of chronic tardiness to appointments, services, visits with children, and her recent tardiness to her children's court hearings, the court reasonably inferred Crystal did not show her circumstances had sufficiently changed where she could consistently meet the children's needs to attend school, obtain appropriate medical and dental care for them, and

transport them to any required therapeutic services on time. We conclude that the court did not abuse its discretion when it denied Crystal's petition to vacate the section 366.26 hearing and extend reunification services to the 18-month review date.

B

*Legal Framework for Termination of Parental Rights and Standard of Review*

At a permanency planning hearing, the court may order one of three alternatives—adoption, guardianship or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id.* at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.) Once the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." " '[B]enefit from continuing the . . . relationship' " means that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

10

The sibling bond exception applies where the parent or sibling proves by a preponderance of evidence that termination of parental rights would substantially interfere with a child's sibling relationship. (§ 366.26, subd. (c)(1)(B)(V).) In determining whether this exception applies, the court considers "whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*; *In re Valerie A*. (2007) 152 Cal.App.4th 987, 1007.)

We determine whether there is substantial evidence to support the court's ruling terminating parental rights by reviewing the evidence most favorably to the prevailing party, and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

C

*There Is Substantial Evidence to Support the Court's Finding the Sibling Bond Exception to Termination of Parental Rights Does Not Apply*

Crystal contends the younger children are bonded with their older siblings, and termination of parental rights would disrupt those bonds and be detrimental to the children's long-term emotional well-being. Mia, A.S, and Christopher join in and adopt Crystal's arguments. They also contend the social worker's opinion that E.D. and D.G. were not bonded with their older siblings does not constitute substantial evidence because the Agency did not

11

meet their responsibilities to ensure frequent sibling visits and the social worker observed only one visit between the siblings.

Appellants do not show that adoption would substantially interfere with E.D.'s and G.D.'s relationships with their older siblings. Aunt C. wanted to adopt E.D. and G.D. She considered the older siblings to be her niece and nephews, and would continue whatever sibling contact she could arrange with their caregivers. The social worker testified that in view of the children's needs and circumstances, there was no possibility of placing them together. (*In re Celine R*. (2003) 31 Cal.4th 45, 61 [sibling bonds should not prevent younger siblings from gaining a permanent home where there were no prospects of placing siblings together].) The record supports the inference it would be detrimental to remove E.D. and G.D. from their aunt's care, who had been involved in their lives since their births and had cared for them full time since April 2013. E.D. was bonded to his cousins and viewed them as his siblings. Thus, a plan of adoption for the younger children would no more interfere with the siblings' relationships than would a plan of guardianship.[2]

The application of the sibling bond exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are of utmost importance. (*In re Valerie A*., *supra*, 152 Cal.App.4th at p. 1014.) G.D. and E.D. are very young children. Even if termination of parental rights would result in severing the younger children's relationships with their older siblings, the record supports a finding that the younger children's long-term emotional interests are better served by having a permanent home

---

[2] The selection of a permanent plan and placement for the older children, particularly for Mia, will be critical in maintaining their bonds with E.D. and G.D. However, the focus of this proceeding is on E.D. and G.D. (See, e.g., *In re Celine R*., *supra*, 31 Cal.4th at pp. 61-62.)

with capable parents than by having ongoing contact with their siblings. The court did not err when it found that the sibling bond exception did not apply. (§ 366.26, subd. (c)(1)(B)(V).)

D

*There Is Substantial Evidence to Support the Court's Finding the Beneficial Parent-Child Relationship Exception to Termination of Parental Rights Does Not Apply*

Crystal asserts the court erred when it determined the beneficial parent-child relationship exception did not apply. She contends that apart from a two-month period after reunification services were terminated, she maintained regular visitation and contact with E.D. and G.D., and the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)

The record does not support Crystal's assertion she maintained regular visitation and contact with E.D. and G.D. Crystal was offered two two-hour visits a week with the younger children. There is substantial evidence in the record to show she visited them only 15 percent of the time. Crystal did not show up for E.D.'s fourth birthday even though she had told Aunt C. she was bringing a birthday cake for him. Her visitation with E.D. and G.D. had been so sporadic Aunt C. thought it better not to tell E.D. about Crystal's plans. The record also supports a finding that Crystal did not maintain regular visitation with the younger children from November 2013 through February 2014. She did not visit or ask to visit E.D. and G.D. for two weeks during the pendency of the section 366.26 hearing in early June. Thus, the record supports the finding that Crystal did not meet her burden to the first prong of section 366.26, subdivision (c)(1)(B)(i).

In her briefing, Crystal focuses on the positive visits she did have with her children, and their delight in seeing her. She discusses E.D.'s repeated entreaties to her not to leave him or to

13

"come with us" but does not consider how her sporadic visitation may have undermined his sense of security. Crystal acknowledged at trial G.D. did not know her as a mother figure. To meet the burden of proof for the beneficial parent/child relationship exception to apply, the parent must show more than frequent and loving contact or pleasant visits. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 953-954.) Even if Crystal could show she maintained regular visitation and contact with her children, which she did not, she does not meet her burden to that the children had a substantial, positive emotional attachment to her that would outweigh the benefit they would receive from adoption. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

Although the record shows that Crystal loves her children, there is substantial evidence to support the finding that termination of parental rights would not be detrimental to E.D. and G.D., and they would greatly benefit from the security of a stable, permanent home with committed, capable adoptive parents. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

## DISPOSITION

The orders are affirmed.

O'ROURKE, J.

WE CONCUR:

MCCONNELL, P. J.

MCDONALD, J.

14